1
2
3
4
5

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
SEONG KIM, Cal. Bar No. 166604
shkim@sheppardmullin.com
1901 Avenue of the Stars, 16th Floor
Los Angeles, California  90067
Telephone:  310.228.3700
Facsimile:   310.228.3701

6
7
8
9
10

LAURA L. CHAPMAN, Cal. Bar No. 167249
lchapman@sheppardmullin.com
LAI L. YIP, Cal. Bar No. 258029
lyip@sheppardmullin.com
TONI QIU Cal. Bar No. 302268
tqiu@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:  415.434.9100
Facsimile:   415.434.3947

11
12
13
14
15
16
17

THE WEBB LAW FIRM
KENT E. BALDAUF JR., *admitted pro hac vice*
KBaldaufJr@webblaw.com
CECILIA R. DICKSON*, admitted pro hac vice*
CDickson@webblaw.com
CHRISTIAN D. EHRET, *admitted pro hac vice*
CEhret@webblaw.com
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
Telephone:  412.471.8815
Facsimile:   412.471.4094

18
Attorneys for Defendant FOREVER 21, INC.

19
UNITED STATES DISTRICT COURT

20
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| PUMA SE, a German company; and PUMA NORTH AMERICA, INC., a Delaware corporation,<br><br>            Plaintiffs,<br><br>       v.<br><br>FOREVER 21, INC., a Delaware corporation,,<br><br>            Defendant. | Case No. 2:17-CV-02523-PSG-E<br><br>**DEFENDANT FOREVER 21, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      June 12, 2017<br>Time:     1:30 p.m.<br>Courtroom: 6A<br><br>Amended Complaint Filed:  04/04/2017<br>Judge:  Hon. Philip S. Gutierrez |

21
22
23
24
25
26
27
28

SMRH:482984747.3

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. INTRODUCTION ................................................................................................1

II. LEGAL STANDARDS .....................................................................................1

III. ARGUMENT ......................................................................................................3

    A. All of Puma's Claims Fail as a Matter of Law ......................................4

        1. Puma Fails To Account For All of the Limitations of the Design Patent ...............................................................................................4

        2. Puma Fails To Define Recognized, Distinctive, Nonfunctional Trade Dress .....................................................................................6

            a. Puma's Asserted "Trade Dress" Is Functional ...................7

            b. Puma Fails To Properly Plead Secondary Meaning ..........8

            c. Puma Is Unlikely to Establish a Likelihood of Confusion ....................................................................................12

        3. Puma Is Unlikely to Succeed on Its Copyright Claims .............14

            a. Puma's Three-Dimensional Shoe Designs Are Not Copyrightable ..................................................................15

            b. Puma's Creeper Copyright Claim Is Unlikely to Succeed ....................................................................................17

            c. Puma's Fur Slide Copyright Claim Is Unlikely to Succeed ....................................................................................18

            d. Puma's Bow Slide Copyright Claim Is Unlikely to Succeed ............................................................................19

    B. Puma Has Not Established a Likelihood of Irreparable Harm .............19

        1. Puma's Speculations Are Not Evidence .....................................20

        2. Puma's Delay Prevents a Finding of Irreparable Harm .............21

    C. A Preliminary Injunction Does Not Favor the Public Interest .............23

    D. The Balance of Equities Do Not Sharply Favor Puma ........................23

    E. Puma's Requested Relief Is Incommensurate With Its Allegations .....24

IV. CONCLUSION ................................................................................................25

**<u>TABLE OF AUTHORITIES</u>**

**<u>Page(s)</u>**

<u>Cases</u>

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*
    280 F.3d 619 (6th Cir. 2002) ..................................................................... 8

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) ........................................................ 2, 20, 23

*Amini Innovation Corp. v. Anthony Calif., Inc.*
    439 F.3d 1365 (Fed. Cir. 2006) ................................................................. 4

*ArcSoft, Inc. v. CyberLink Corp.*
    153 F. Supp. 3d 1057 (N.D. Cal. 2015) ..................................................... 2

*Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*
    501 F.3d 1314 (Fed. Cir. 2007) ................................................................. 4

*Aurora World, Inc. v. Ty Inc.*
    719 F. Supp. 2d 1115 (C.D. Cal. 2009) ................................................... 15

*Baby Buddies, Inc. v. Toys R Us, Inc.*
    611 F.3d 1308 (11th Cir. 2010) ............................................................... 19

*Brookfield* .............................................................................................. 14

*Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*
    815 F.2d 500 (8th Cir. 1987) ................................................................... 23

*In the Matter of Certain Footwear Products*
    Inv. No. 337-TA-936 (July 6, 2016) ......................................................... 9

*Clamp Mfg. Co. v. Enco Mfg. Co.*
    870 F.2d 512 (9th Cir.1989) ..................................................................... 9

*Coach Servs., Inc. v. Triumph Learning LLC*
    668 F.3d 1356 (Fed. Cir. 2012) ................................................................. 9

*ConWest Res., Inc. v. Playtime Novelties, Inc.*
    No. C 06-5304 SBA, 2006 WL 3346226, at *6 (N.D. Cal. Nov. 17,
    2006) ........................................................................................................ 14

*Duraco Prods. v. Joy Plastic Enters*.
   40 F.3d 1431 (3d Cir. 1994) ................................................................. 8

*eBay Inc. v. MercExchange, L.L.C.*
   547 U.S. 388 (2006) .................................................................... 2, 21

*Egyptian Goddess, Inc. v. Swisa, Inc.*
   543 F.3d 665 (Fed. Cir. 2008) ............................................................. 5

*Eliya, Inc.*
   2006 WL 2645196, at *12 ......................................................... 17, 18, 19

*Fusion Windows & Doors, Inc.*
   2013 WL 12126108, at *4 ................................................................ 17

*Garcia v. Google, Inc.*
   786 F.3d 733 (9th Cir. 2015) ............................................................ 21

*GoTo.com v. Walt Disney Co.*
   202 F.3d 1199 (9th Cir. 2000) .......................................................... 14

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*
   736 F.3d 1239 (9th Cir. 2013) ...................................................... 2, 21

*Inhale, Inc. v. Starbuzz Tobacco, Inc.*
   739 F.3d 446 (9th Cir. 2014) ........................................................... 16

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*
   4 F.3d 819 (9th Cir. 1993) ............................................................... 3

*Inwood Labs., Inc. v. Ives Labs., Inc.*
   456 U.S. 844 (1982) ...................................................................... 7

*L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co.*
   79 F.3d 258 (2d Cir. 1996) ............................................................. 10

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*
   941 F.2d 970 (9th Cir. 1991) ........................................................... 25

*Lindberg A/S v. Kazak-Mars, Inc.*
   No. 213CV04808SVWAGRX, 2013 WL 12138762 (C.D. Cal. Aug.
   28, 2013) ................................................................................ 24

*Lydo Enters. Inc. v. Las Vegas*
   745 F.2d 1211 (9th Cir. 1984) ...................................................... 2, 3

-iii-

*Mandrigues v. World Sav., Inc.*
    No. C 07-4497, 2009 WL 160213 (N.D. Cal. Jan. 20, 2009) ............................... 3

*In re Mann*
    861 F.2d 1581 (Fed. Cir. 1988) ................................................................................. 4

*Mazurek v. Armstrong*
    520 U.S. 968 (1997) .................................................................................................. 1

*Motorola Inc. v. Qualcomm Inc.*
    45 U.S.P.Q.2d 1558 (S.D. Cal. 1997), *aff'd without op.*, 135 F.3d
    776 (Fed. Cir. 1998) ............................................................................................... 12

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*
    638 F.3d 1137 (9th Cir. 2011) ................................................................................ 14

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*
    762 F.2d 1374 (9th Cir. 1985) .................................................................................. 3

*Olem Shoe Corp. v. Washington Shoe Co.*
    2011 WL 6202282 (S.D. Fla. 2011) .................................................................... 9, 18

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*
    602 F. App'x 669 (9th Cir. 2015) ......................................................................... 25

*P.F. Cosmetique, S.A. v. Minnetonka, Inc.*
    605 F. Supp. 662 (S.D.N.Y. 1985) ....................................................................... 13

*Pagliero v. Wallace China Co.*
    198 F.2d 339 (9th Cir. 1952) ................................................................................... 7

*Pasillas v. McDonald's Corp.*
    927 F.2d 440 (9th Cir. 1991) ................................................................................. 17

*Protech Diamond Tools, Incorporation v. Liao*
    No. C 08-3684 SBA, 2009 WL 1626587, at *6 (N.D. Cal. June 8,
    2009) ...................................................................................................................... 21

*Sapiano v. Millennium Entm't, LLC*
    No. CV128122PSGMANX, 2013 WL 12122435 (C.D. Cal. Mar.
    15, 2013) ............................................................................................................. 2, 20

*SCOA Indus., Inc. v. Famolare, Inc.*
    No. 75 CIV. 3357 IBW, 1976 WL 21086 (S.D.N.Y. Feb. 13, 1976) ........... 15, 18

*Sharper Image Corp. v. Target Corp.*
   425 F. Supp. 2d 1056 (N.D. Cal. 2006) ................................................. 9

*Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v.*
   *Alexander's Dep't Stores, Inc.*
   299 F.2d 33 (2d Cir. 1962) ................................................................... 23

*Spark Indus., LLC v. Kretek Int'l, Inc.*
   No. CV 14-5726-GW ASX, 2014 WL 4365736 (C.D. Cal. Aug. 28,
   2014) ..................................................................................................... 24

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*
   137 S. Ct. 1002 (2017) ...................................................... 16, 17, 19

*Titaness Light Shop, LLC v. Sunlight Supply, Inc.*
   585 F. App'x 390 (9th Cir. 2014) ........................................................ 21

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*
   529 U.S. 205 (1999) ...................................................................... 8, 23

*Waldmann Lighting Co. v. Halogen Lighting Sys., Inc.*
   No. 91 C 3491, 1993 WL 243388 (N.D. Ill. July 1, 1993) ................... 23

*Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*
   916 F.2d 76 (2d Cir. 1990) .................................................................... 7

*Williams v. Green Valley RV, Inc.*
   No. 15-cv-01010, 2015 WL 4694075 (C.D. Cal. Aug. 6, 2015) ...... 2, 20

*Winter v. Nat'l Res. Def. Council, Inc.*
   555 U.S. 7 (2008) ........................................................................ 1, 2, 3

Statutes

15 U.S.C. § 1052(e)(5) .................................................................................. 7

Other Authorities

4 McCarthy on Trademarks and Unfair Competition
   § 24:53.50 (4th ed.) ............................................................................. 14

*McCarthy on Trademarks & Unfair Comp.*
   § 8:15 (4th ed.) .................................................................................... 14

U.S. Copyright Office, Compendium of U.S. Copyright Office
   Practices
   § 505.04 (2d ed. 1984) ........................................................................... 16

U.S. Copyright Office, Compendium of U.S. Copyright Office
   Practices
   § 924.2(B) ............................................................................................. 16

U.S. Copyright Office, Compendium of U.S. Copyright Office
   Practices
   § 934.1 (3d ed. 2014) ............................................................................ 16

SMRH:482984747.3
Case No. 2:17-CV-02523-PSG-E
DEFENDANT FOREVER 21, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

## I.     INTRODUCTION

Thinly-veiled anticompetitive intent, coupled with speculation and conclusory statements, does not justify the granting of preliminary, extraordinary relief. Puma's motion to preliminarily enjoin Forever 21 from selling classic shoe designs (hereinafter "Motion") must be denied because Puma's claims are not likely to succeed on the merits and, even if Puma had stated actionable claims, it cannot demonstrate the requisite immediacy or irreparability of harm.  Instead, this Court should grant Forever 21's Motion To Dismiss the First Amended Complaint ("Motion to Dismiss") in its entirety, DE 45.

Puma, is one of *dozens* of companies that offer the classic shoe designs at-issue in this case.  A cursory glance at the shoe marketplace contradicts Puma's purported originality and reveals that the designs Puma claims as its own are commonplace and have been historically offered by various designers (under different brands, for decades in some cases), at a wide range of price points.  Puma availed itself of these classic designs as much as any other designer.  Puma would have this Court rush to judgment based on what "may" or "could" occur, rather than on the record before this Court, which demonstrates that Puma is not likely to succeed and is not entitled to any relief, preliminarily or otherwise.  Puma's attempt to shut down legitimate competition should be rejected.

## II.     LEGAL STANDARDS

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted) (emphasis in original).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The "irreparable harm [must be] real and significant, not speculative or remote." *Sapiano v. Millennium Entm't, LLC*, No. CV128122PSGMANX, 2013 WL 12122435, at *5 (C.D. Cal. Mar. 15, 2013) (quoting *Winter*, 555 U.S. at 22); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.").

The movant bears the burden to "proffer evidence sufficient to establish a likelihood of irreparable harm." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013). The "risk of such harm must be established by specifically relevant evidence, not by 'platitudes' or evidence that merely 'underscores customer confusion.'" *ArcSoft, Inc. v. CyberLink Corp.*, 153 F. Supp. 3d 1057, 1071 (N.D. Cal. 2015) (citing *Herb Reed*, 736 F.3d at 1250); *see also Williams v. Green Valley RV, Inc.*, No. 15-cv-01010, 2015 WL 4694075, at *2 (C.D. Cal. Aug. 6, 2015) ("Plaintiff's evidence of irreparable harm is nothing more than a regurgitation of consumer confusion evidence, which is the *exact* type of evidence explicitly rejected by the Ninth Circuit in *Herb Reed.* Plaintiff relies on only consumer confusion evidence and wants the Court to believe that he *might* suffer damage to his reputation or goodwill.") (emphasis in original). In particular, "irreparable harm is not presumed in the context of copyright infringement." *Sapiano*, 2013 WL 12122435, at *5 (citing *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011)).

A party seeking a preliminary injunction must also establish that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Lydo Enters. Inc. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (explaining that if money damages or other relief granted in the ordinary course of litigation can adequately compensate the plaintiff, irreparable injury probably will not follow the denial of a preliminary injunction).

1   "A delay in seeking a preliminary injunction is a factor to be considered in
2   weighing the propriety of relief." *Lydo Enters*, 745 F.2d at 1213. "A preliminary
3   injunction is sought upon the theory that there is an urgent need for speedy action to
4   protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the
5   lack of need for speedy action." *Id.* (citation omitted); *see also Oakland Tribune,*
6   *Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long
7   delay before seeking a preliminary injunction implies a lack of urgency and
8   irreparable harm.").

9   Even where a plaintiff succeeds in showing some level of imminent,
10   irreparable harm, the "extraordinary" nature of preliminary injunctive relief
11   nonetheless requires that courts "balance the competing claims of injury and . . .
12   consider the effect on each party of the granting or withholding of the requested
13   relief." *Mandrigues v. World Sav., Inc.*, No. C 07-4497, 2009 WL 160213, at *7
14   (N.D. Cal. Jan. 20, 2009) (quoting *Winter*, 129 S. Ct. at 376). In evaluating the
15   balance of hardships, a court must consider the impact granting or denying a motion
16   for a preliminary injunction will have on the respective parties' business. *Int'l*
17   *Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993).

18   ## III.   ARGUMENT

19   Puma is not entitled to a preliminary injunction because it has not established
20   that: (1) it is likely to succeed on the merits of its claims; (2) it will suffer
21   irreparable harm absent injunctive relief; (3) injunctive relief is in the public
22   interest; and (4) the balance of equities tip *sharply* in its favor. Puma's Motion is
23   replete with statements of the law (at least one of which has been explicitly
24   overruled) and speculative conclusions about what "may" or "could" occur, but does
25   not come close to meeting the high burden of proof required for the extraordinary
26   relief it requests.

27

28

### A.    All of Puma's Claims Fail as a Matter of Law

For at least the reasons discussed in Forever 21's Motion to Dismiss (DE 45) and those presented below, Puma's substantive claims fail as a matter of law and thus, its request for a preliminary injunction should be denied.

### 1.    Puma Fails To Account For All of the Limitations of the Design Patent

Puma dedicates less than a single page in its Motion to its design patent claim pertaining to Forever 21's YOKI creepers.  DE 21 at 29-30.  Puma's brevity is fatal to its Motion—it fails to address the majority of limitations of the asserted design patent claim and, moreover, fails to show that the small subset of limitations it actually does identify are present in the accused creepers.

Design patent protection is "limited to what is shown in the application drawings."  *In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir. 1988).  Even if the '288 Patent is valid (which is unlikely), Forever 21's YOKI creepers are well outside of Puma's exceedingly narrow design patent rights, especially when the correct legal standard (which Puma neglected to cite) is applied.  For example, in asserting that it is likely to succeed in proving that Forever 21's YOKI creeper infringes the '288 Patent, Puma deceivingly compares only a single view (Fig. 4) of the '288 Patent with a single side-view of the accused YOKI creeper.  DE 21 at 30.  To infringe, however, an accused design "must encompass the claimed ornamental features of *all figures* of a design patent." *Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1320 (Fed. Cir. 2007) (emphasis in original); *see also Amini Innovation Corp. v. Anthony Calif., Inc.*, 439 F.3d 1365, 1371 (Fed. Cir. 2006) ("[T]he deception that arises is a result of similarities in the overall design, not of similarities in ornamental features considered in isolation").

Examining the limitations of the '288 Patent in the *seven additional figures* omitted from Puma's Motion reveals the implausibility of Puma's claim.  Fig. 3, for example, shows a trapezoidal limitation that is absent from the accused creeper:





FIG. 3
'288 Patent
Fig. 3

FIG. 3
'288 Patent
Fig. 3 (annotated)

Accused
product

Even ignoring the *seven figures* and the numerous limitations omitted from Puma's Motion, there are clear and unmistakable differences between the YOKI creeper and the small subset of limitations in Fig. 4 that Puma chose to address in its Motion. For example, the relative height of the sole with respect to the upper, the use of ornamental/visible stitching, and the number and placement of the ventilation holes are all significantly different:




FIG. 4

'288 Patent, Fig. 4 (annotated)          Accused product (annotated)

Because the two designs are, as a whole, "plainly dissimilar," Puma has no reasonable chance of success. *See Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008). The accused YOKI creeper could not possibly infringe the '288 Patent because the only alleged similarities are found in the prior art and, thus, an ordinary observer would focus on the features that differ between the '288 Patent and the prior art (which, in this case, do not appear in the YOKI creeper). *See id.* at 681 (requiring that infringement be determined in the context of the prior art). Puma identifies 4 elements it accuses of being similar: "[1] lace-up sneakers with [2] vertical ridged tooling around the rubber outer sole, a [3] rubber ridge encircling the entire shoe immediately above the vertical ridged tooling, and [4] a

SMRH:482984747.3

deep 'C'-shaped bowl for the foot to slide into."  DE 21 at 29.  Each of these elements are shown in the prior art cited on the face of the '288 Patent, including Puma's own prior design:

 1   2   3

An ordinary observer familiar with these prior art shoes would focus more on the features that differ from the prior art, such as the number and placement of ventilation holes, the trapezoidal shape on the back, and the lack of ornamental, visible stitching.  The absence of such features in the YOKI creeper (and the absence of averments that such features are present in the YOKI creeper) makes Puma's claim facially implausible and unlikely to succeed.

Accordingly, for at least the foregoing reasons, Puma has no chance of success on its claim of design patent infringement.

## 2. Puma Fails To Define Recognized, Distinctive, Nonfunctional Trade Dress

Puma is unlikely to prevail on its trade dress claim because it cannot clearly identify the trade dress or show that it is nonfunctional, has secondary meaning, and is likely to be confused with the accused products.  Puma plays fast and loose with the scope of the alleged "trade dress," which it never clearly articulates.  For example, although Puma *never identifies color as part of its trade dress* (presumably because even Puma recognizes it would have no basis to claim secondary meaning

---

[1] "Mr. Completely Nike and Adidas Creepers," dated Oct. 28, 2014, http://thesnobette.com/2014/10/mr-completely-nike-adidas-creepers/.

[2] "Mr. Completely Shoes-Haus of Rihanna," dated Oct. 27, 2014, http://hausofrihanna.com/rihanna-puma-creative-director/mr-completely-puma-creepers-puma/.

[3] "Mr. Completely Shoes-Haus of Rihanna," dated Oct. 27, 2014, http://hausofrihanna.com/mr-completely-adidas-creepy-samba-shoes/.

in any of the colors of its products), it attempts to shoehorn this element into the analysis at every possible opportunity to deceivingly imply that it is relevant.  DE 21 at 15 ("in the same two colors"); *id*. at 20 ("shoes do not require 'olive branch' colored satin bows"); *id.* at 23 ("Defendant also wholly reproduces Puma's casually knotted fabric bow with pointed endings and Defendant's 'olive' and 'dusty pink' color options.").  Puma is required to specifically define its purported trade dress but has failed to do so.

### a.   Puma's Asserted "Trade Dress" Is Functional

Functional features are not entitled to protection as a trademark or trade dress. 15 U.S.C. § 1052(e)(5).  Although the Trademark Act does not define the term "functional," the Supreme Court has explained that a product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost of quality of the article."  *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982). Courts hesitate to grant broad trade dress rights in mere ornamentation based on the "aesthetic functionality" doctrine because, as with mechanically functional features, doing so would stifle legitimate competition.  *See, e.g.*, *Pagliero v. Wallace China Co*., 198 F.2d 339 (9th Cir. 1952) (designs on china not protected because aesthetically functional; consumers bought the plaintiff's china because they thought it was beautiful, but it did not see source-identifying significance in the design); *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76 (2d Cir. 1990) (silversmith denied broad trade dress rights in a baroque design on its silverware on aesthetic functionality grounds because silversmiths commonly wish to embellish their silverware with baroque patterns and compete in the marketplace).

In Puma's Motion, only a conclusory statement is provided concerning the non-functional nature of Puma's shoes. DE 21 at 20.  Indeed, the Motion takes the opposite approach by choosing to characterize the elements of alleged trade dress with functional language and identification of functional shoe components (*i.e.*, "a deep 'C'-shaped bowl *for the foot to slide into*", "thick sandal base", "strap", and

-7-

"deep bowl *for the foot*").  DE 21 at 23 (emphasis added).  Puma's reliance on functionality for its purported trade dress is fatal to its likelihood of success. *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSX), 2015 WL 12731929, at *4 (C.D. Cal. May 8, 2015) (in a similar case involving UGG® footwear, dismissing a complaint because "conclusory statements of non-functionality fail[] to sufficiently allege the element, particularly because some features of the claimed trade dress do perform utilitarian functions in certain contexts (*i.e.*, buttons or adjustable overlapping flaps)").

### b.   Puma Fails To Properly Plead Secondary Meaning

Puma's trade dress claim also hits another wall—Puma must establish secondary meaning in common, well-known shoe designs that predate Puma and are offered by dozens of different designers, and it simply cannot do that.  Secondary meaning exists when "the primary significance" of the claimed trade dress is to "identify the source of the product rather than the product itself."  *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 211-13, 216 (1999).  Product designs are notoriously difficult to serve as trade dress because of the difficulty in establishing secondary meaning.  *Duraco Prods. v. Joy Plastic Enters.*, 40 F.3d 1431, 1454 (3d Cir. 1994) ("In sum, secondary meaning in a product configuration case will generally not be easy to establish.").

Trade dress is classically sorted into two categories—product packaging and product configuration.  In cases of product configuration, like this case, configuration can never be inherently distinctive.  "No designer should have a monopoly on designs regarded by the public as the basic form of a particular item." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 637 (6th Cir. 2002).  "While most trademarks only create a monopoly in a word, a phrase or a symbol, granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).  Thus, for product configuration matters,

1  establishing secondary meaning is an uphill battle. *See, e.g.*, *Olem Shoe Corp. v.*
2  *Washington Shoe Co*., 2011 WL 6202282 (S.D. Fla. 2011) (in a product
3  configuration case for women's boots, rejecting evidence of secondary meaning
4  relating to company sales and advertising history).

5      Puma's arguments that its alleged trade dress is "source identifying" fail
6  because they ignore the appearance of its own products and the context in which
7  they are sold on the market.  Although Puma attempted to use photographs in its
8  Motion that minimize the prominence of its word and design marks on its products,
9  from almost every other angle the PUMA and FENTY wordmarks and design marks
10 adorn the products and are the product source identifiers:

   

15     Independent, third party use of the asserted trade dress makes it impossible
16 for Puma to establish secondary meaning in its alleged trade dress because, when
17 one looks at the marketplace and other competitors' products, Puma's word and
18 design marks are *the only distinguishing aspects* of its shoes.  *See Coach Servs., Inc.*
19 *v. Triumph Learning LLC*, 668 F.3d 1356, 1380 (Fed. Cir. 2012) (holding that "the
20 Board's failure to consider all pre-decision third-party use of the term 'coach' for
21 educational materials undermines its secondary meaning analysis"); *In the Matter of*
22 *Certain Footwear Products*, Inv. No. 337-TA-936 (July 6, 2016) (third party use of
23 designs defeated trade dress claims),
24 http://www.itcblog.com/images/commopin936.pdf; *Sharper Image Corp. v. Target*
25 *Corp.*, 425 F. Supp. 2d 1056, 1073 (N.D. Cal. 2006) ("Factors to be assessed in
26 determining secondary meaning include … whether the plaintiff's use of the design
27 has been exclusive.") (citing *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517

1   (9th Cir.1989)); *see also L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co.*, 79

2   F.3d 258, 264 (2d Cir. 1996) (vacating preliminary injunction due to lack of

3   secondary meaning in a reproduction of a classic furniture design).

4          The ubiquitous use of the asserted trade dress by third-parties, in the same

5   retail channels as Puma's products, defeats secondary meaning.  Puma's Motion

6   contends that the shoes at-issue in this case are "currently being sold in both brick-

7   and-mortar stores and online retailers such as Neiman Marcus, Nordstrom's, Urban

8   Outfitters, and Bloomingdales, among others."  DE 21 at 11.  Yet, a search for the

9   terms "creeper," "fur slide," and "bow slide" on those retailers' websites and other

10   retailer websites reveals numerous uses of the asserted trade dress by various

11   designers.  *See* Exhs. 1-8 to Req. Judicial Notice ("RJN"), DE 47.  For example,

12   without word marks, any consumer would have difficulty distinguishing Puma's

13   shoes from shoes offered by other companies at prices both lower and higher than

14   Puma's price points.  The following tables each depict shoes made by different

15   manufacturers and sold at various price points through a variety of retailers:

| "Fur Slides" by Different Designers/Manufacturers |
|---|



The above table includes Puma's fur slides, Forever 21's fur slides, and fur slides

sold by Steve Madden, Givenchy, Vince, Seychelles and others, many of which are

SMRH:482984747.3          DEFENDANT FOREVER 21, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

sold in the same stores identified in Puma's Motion, including, for example, Bloomingdale's. *See* DE 21 at 11. Vince's fur slides are sold at Bloomingdale's for $250, and Givenchy's fur slides are sold at Neiman Marcus for $595. Exhs. 1 & 3 to RJN, DE 47-1, 47-3.

| **"Creepers" by Different Designers/Manufacturers** |
| --- |



The above table includes Puma's creeper, two of Forever 21's creepers, and creepers sold by Nike, HerStyle, Steve Madden, Urban Outfitters, Barney's, and others, all at different price points. *See* Exhs. 7-8 to RJN, DE 47-7, 47-8. The Barney's sneakers are sold for $275 (*see* Exh. 1 attached hereto and filed herewith) and the HerStyle's sneakers are sold for $17.99. *See* Exh. 8 to RJN, DE 47-8.

/ / /

/ / /

/ / /

/ / /

/ / /

1

| "Bow Slides" by Different Designers/Manufacturers |
|---|



2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

    The above table includes Puma's bow slide, Forever 21's accused slide, and bow slides sold by Michael Kors, Zara, Prada, Cape Robbin, Brother Vellies, and others, all at different price points.  *See* Exhs. 4-5 to RJN, DE 47-4, 47-5; Exhs. 2-4 (attached hereto and filed herewith).  For example, the Brother Vellies bow slide sells for about $328, the Michael Kors bow slide sells for $120, and the Cape Robbin bow slide sells for $23.  *Id.*

    In sum, the staggering number of similar shoes offered across the consumer and retail spectrum defeats Puma's alleged secondary meaning as a matter of law.

        **c.**    **Puma Is Unlikely to Establish a Likelihood of Confusion**

    Puma's arguments directed to showing a likelihood of confusion address only functional and commonplace design attributes of the shoes that are not protectable.

18
19
20
21
22
23
24
25
26
27
28

Case No. 2:17-CV-02523-PSG-E

DEFENDANT FOREVER 21, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  *See Motorola Inc. v. Qualcomm Inc.*, 45 U.S.P.Q.2d 1558 (S.D. Cal. 1997), *aff'd*

2  *without op.*, 135 F.3d 776 (Fed. Cir. 1998) ("While [defendant's] phone has many of

3  the same features as [plaintiff's phone], many of these features are functional and

4  the two phones are sufficiently distinct.").

5         In its attempt to show that its trade dress is source identifying, Puma cites to

6  postings by three internet users establishing that consumers *have not been confused*

7  as to the source of Forever 21's accused products.  DE 21 at 21.  This evidence—the

8  only consumer evidence offered by Puma—directly conflicts with Puma's

9  conclusory argument that "both retailers and consumers have been confused about

10  the origin of Defendant's products, and that further confusion is likely."  *Id*. at 22.

11  Although Puma is quick to declare that "both retailers and consumers have been

12  confused," it cites *no evidence* in support of this statement and, tellingly, later

13  argues that "actual confusion is not necessary."  *Id*. at 21, 27.

14         Consumer confusion between Puma's products and Forever 21's products is

15  impossible because there are too many similar products on the market and Puma is

16  not the first shoe designer to market such designs.  Moreover, consumers expect

17  Puma products to have logos and the PUMA wordmark, and would therefore not be

18  confused by classic shoe styles without Puma's marks.[4]

19         Puma's argument that its shoes and the accused shoes "compete directly" fails

20  to consider the crowded marketplace filled with nearly identical shoes.  *See* DE 21

21  at 24.  Instead, Puma deceivingly implies that it and Forever 21 are the *only* market

22  participants.  *See id.*  As shown above, the number of competitors in the market are

23  countless.  The relative strength of asserted trade dress must be considered in a

24  likelihood of confusion analysis; the fact that the claimed trade dress includes

25  elements commonly used by many competitors weighs against a likelihood of

26  ────────────────
[4] Puma's website emphasizes the importance of its marks for identifying the source

27  of its products.  http:// http://about.puma.com/en/this-is-puma/history ("The logo
with the jumping cat, today one the most famous trademarks worldwide") (last

28  accessed May 16, 2017).

1   confusion.  *See P.F. Cosmetique, S.A. v. Minnetonka, Inc.*, 605 F. Supp. 662

2   (S.D.N.Y. 1985) (finding no likelihood of confusion because the main features of

3   the product packaging were designs and motifs commonly used by several

4   competitors); *see also McCarthy on Trademarks & Unfair Comp.* § 8:15 (4th ed.).

5       As a last resort, Puma deceivingly cites to outdated case law from the Court

6   of Appeals for the Ninth Circuit to argue that "[c]ourts have consistently recognized

7   that using the internet as a marketing and advertising facility exacerbates likelihood

8   of confusion." DE 21 at 24 (citing *GoTo.com v. Walt Disney Co.*, 202 F.3d 1199,

9   1207 (9th Cir. 2000)).  Puma's citation is troubling—the Ninth Circuit has explicitly

10  overruled the *GoTo.com* decision, stating that "[t]oday, it would be the rare

11  commercial retailer that did not advertise online, and the shared use of a ubiquitous

12  marketing channel does not shed much light on the likelihood of consumer

13  confusion."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d

14  1137, 1153 (9th Cir. 2011) ("Therefore the district court improperly concluded that

15  this factor weighed in Systems' favor based on a conclusion reached by our court

16  more than a decade ago in *Brookfield* and *GoTo.com* that Internet users on the whole

17  exercise a low degree of care."); *id.* at 1151-52 ("[T]he default degree of consumer

18  care is becoming more heightened as the novelty of the Internet evaporates and

19  online commerce becomes commonplace.").[5]

20      For at least the foregoing reasons, Puma has no chance of success on its claim

21  of trade dress infringement.

22               **3.    Puma Is Unlikely to Succeed on Its Copyright Claims**

23      Puma has yet to obtain copyright registrations for its asserted shoe designs—a

24  significant hurdle considering the unprotectable nature of what Puma is attempting

25

26  [5] A leading trademark treatise dedicates a section to this issue, explaining why the *GoTo.com* decision is no longer relevant in the Ninth Circuit or elsewhere.  4

27  McCarthy on Trademarks and Unfair Competition § 24:53.50 (4th ed.) ("That the goods or services of the parties are both found on the Internet proves little, if

28  anything, about the likelihood [of consumer confusion over similar marks].").

to claim.  *See ConWest Res., Inc. v. Playtime Novelties, Inc.*, No. C 06-5304 SBA, 2006 WL 3346226, at *6 (N.D. Cal. Nov. 17, 2006) (considering originality, statements by the Copyright Examiner, and functionality in a preliminary injunction context).  What's worse is, as discussed in more detail below with respect to irreparable harm, Puma specifically chose to delay examination by the Copyright Office prior to seeking a preliminary injunction instead of requesting special handling like most serious litigants do prior to filing a complaint.  *See infra* at Section III(B)(2).  Indeed, even though it has now tried to patch up the failings in its First Amended Complaint by finally disclosing the copyright applications (excluding the deposits, so Forever 21 still does not know what Puma filed on), on May 15, 2017—around six weeks after they were filed—Puma has still taken no action to expedite consideration of the copyright applications with the Copyright Office, although it nonetheless seeks to rush this Court to conclude that preliminary injunctive relief is warranted based on the mere application for copyright protection.

Puma's failure to plead sufficient details concerning attempts at registration, including Special Handling and including copies of the deposit materials, warrants dismissal of the complaint and prohibits a preliminary injunction from being issued. *See, e.g.*, *Aurora World, Inc. v. Ty Inc*., 719 F. Supp. 2d 1115, 1130 (C.D. Cal. 2009) ("No court has held that a plaintiff can satisfy § 411(a) simply by placing the registration application, fee and deposit in the mail prior to filing suit, and ***the statute requires receipt of <u>all three items</u>, not simply the application itself***, by the Copyright Office before suit is initiated.") (emphasis added).

### a.   <u>Puma's Three-Dimensional Shoe Designs Are Not Copyrightable</u>

Design elements of a shoe, other than two-dimensional images printed on the material of the footwear, are not subject to copyright protection.  *See SCOA Indus., Inc. v. Famolare, Inc*., No. 75 CIV. 3357 IBW, 1976 WL 21086, at *2 (S.D.N.Y. Feb. 13, 1976) (in the context of a copyright claim for a shoe design, holding that

-15-

1  "**[t]here can be no valid copyright in troughs in the sole or wavy lines on the**

2  **sides**" because "[t]hese have no existence as works of art and if they did have lack

3  even the minimum originality needed for copyright.") (emphasis added).  Three-

4  dimensional "design features of [a shoe] do not represent independent artistic

5  expression, as would an image displayed on the shoe's surface."  *Eliya, Inc. v.*

6  *Kohl's Dep't Stores*, No. 06 CIV.195(GEL), 2006 WL 2645196, at *12 (S.D.N.Y.

7  Sept. 13, 2006) (holding that a shoe design is not copyrightable because "the

8  features reflect the designer's decisions regarding how best to implement a shoe's

9  functional purposes-how to, in an aesthetically pleasing manner, keep the shoe

10  attached to the wearer's feet, hold the material of the shoe together, cushion the

11  wearer's feet, and provide traction on various surfaces.").  Even where some design

12  choices "reflect more concern for form than for function[,]…the blending of form

13  and function in the [] design results in the exclusion of its design elements from

14  copyright protection."  *Id.*

15      Puma presumably delayed examination of its copyright applications because

16  the Copyright Office guidelines specifically list "shoes" as useful articles that are

17  *not protectable* without separable copyrightable expression.  *See* U.S. Copyright

18  Office, Compendium of U.S. Copyright Office Practices § 934.1 (3d ed. 2014).  The

19  Copyright Office guidelines also provide that, "[i]f the feature is an integral part of

20  the overall shape or contour of the useful article, that feature cannot be considered

21  conceptually separable because removing it would destroy the basic shape of the

22  useful article."  *Id.* at § 924.2(B); *see also* U.S. Copyright Office, Compendium of

23  U.S. Copyright Office Practices § 505.04 (2d ed. 1984) ("However, since the overall

24  shape of a useful article is not copyrightable, the test of physical separability is not

25  met by the mere fact that the housing of a useful article is detachable from the

26  working parts of the article"); *Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 739 F.3d 446,

27  449 (9th Cir. 2014) (giving deference to Copyright Office guidance).

28      Puma erroneously relies on the recent Supreme Court decision in *Star*

-16-

DEFENDANT FOREVER 21, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR
                           PRELIMINARY INJUNCTION

*Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002 (2017) to imply that the law has changed in its favor.  It has not.  The registrations at-issue in *Star Athletica* were **two-dimensional** designs including "various lines, chevrons, and colorful shapes" for cheerleader uniforms that could be envisioned as a two-dimensional work of art on a medium other than the uniforms.  *Id.* at 1004.  In this case, by contrast, Puma asserts alleged copyrights in the *idea* of a shoe design or, at best, three-dimensional elements, that are not separable from the useful article or independently copyrightable.  *See, e.g.*, *Eliya, Inc.*, 2006 WL 2645196, at *12.

"Ultimately, only protectable aspects of a work may be considered when determining whether infringement has occurred."  *Fusion Windows & Doors, Inc. v. Am. Reliable Windows, Inc.*, No. CV 13-1022 PSG (JCX), 2013 WL 12126108, at *4 (C.D. Cal. July 12, 2013) (citing *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 443 (9th Cir. 1991)).  And even if any of the asserted elements *could* be separated from the work, those elements, when removed from the useful articles, lack originality and/or were borrowed from third-party works.  *See, e.g.*, *id.* at *3 (holding that "because the scope of copyright protection does not extend to templates owned by others, Plaintiff has not sufficiently alleged a claim for copyright infringement").

        **b.**      **Puma's Creeper Copyright Claim Is Unlikely to Succeed**

With respect to Puma's Creeper, the Motion focuses on the soles and alleges only two copyrightable elements, both ubiquitous and functional features of "creeper" soles: "[1] **the ridged vertical tooling and** [2] **grainy texture encompassing the rubber outer sole**."  DE 21 at 29.  Puma fails to identify or explain how a sole of a shoe is separable from the shoe itself or how these elements "can be perceived as a two- or three-dimensional work of art separate from the useful article."  *Star Athletica*, 137 S. Ct. at 1016.  Instead, Puma jumps to the unsupported conclusion that the "ridged vertical tooling and grainy texture" could exist on its own or in some other tangible medium.  DE 21 at 29.  The "ridged

vertical tooling" is part of the overall shape of the shoe which is *not* protectable under copyright law.  *See SCOA Indus., Inc.*, 1976 WL 21086, at *2 (finding that "troughs in the sole [of a shoe] or wavy lines on the sides [of a shoe]" are not protectable under copyright law); *Eliya, Inc.*, 2006 WL 2645196, at *12.  It is likewise inconceivable how a grainy *texture* could be separable from a sole.

Even assuming, *arguendo*, that "the ridged vertical tooling and grainy texture" could somehow be separated, such elements fail to meet the minimum threshold of originality.  *See SCOA Indus., Inc.*, 1976 WL 21086, at *2 (holding that "troughs in the sole or wavy lines on the sides [of a shoe]… have no existence as works of art and if they did have lack even the minimum originality needed for copyright.").  These features are not original works of art by Puma.

### c.   Puma's Fur Slide Copyright Claim Is Unlikely to Succeed

With respect to the "Fur Slide," Puma appears to claim that it has a copyright in the "*fur*" itself.  DE 21 at 29 ("[T]he fur from the Fenty Fur Slide when removed could be applied to any other medium").  This is a shift in position from the First Amended Complaint, which identifies "*a wide plush fur strap extending to the base of the sandal*."  DE 12, ¶ 38.  Either way, Puma's claim that it owns exclusive rights to "fur" or "a wide plush fur strap" defies basic principles of copyright law and is unlikely to succeed.  The "wide plush fur strap" is not separable from the "sandal" because removing the strap changes the entire shape and contour of the sandal and because the purpose of a strap is to keep a person's foot in the sandal.  *Eliya, Inc.*, 2006 WL 2645196, at *12 (holding that "a strap" for a shoe is not copyrightable because, in part, the alleged design elements "keep the shoe attached to the wearer's feet [and] hold the material of the shoe together"); s*ee also Olem Shoe Corp.*, 2011 WL 6202282, at *16 (finding that, for a boot with a zebra-like pattern and a strap, "the protectable elements … are limited only to the conceptually severable patterned designs on the face of the boots and not any utilitarian functions of the boots").

Even putting separability aside, it is equally inconceivable to imagine how a

piece of fur material, without any specific pattern, design, or artistic features, can be considered an original work of art.  Puma provides no explanation for how its "fur" is supposedly original.  For at least these reasons, Puma's copyright claim for the Fur Slides is unlikely to succeed.

### d.   Puma's Bow Slide Copyright Claim Is Unlikely to Succeed

A sandal with a bow on top is also not protectable.  Puma appears to claim in its Motion that it has a copyright in "*casually knotted fabric*."  DE 21 at 29.  In its First Amended Complaint, Puma states it differently as a "*casually knotted fabric bow with pointed endings atop a lined side strap that extends to the base of the sandal*."  DE 13, ¶ 39.  Like the "fur" and "wide plush fur strap," there is no legal basis for Puma's claim of copyright protection for a knotted fabric.  A "fabric bow with pointed endings atop a lined side strap" is not separable from the shoe because removing the strap changes the entire shape and contour of the shoe.  The "lined side strap" affixes the shoe to a person's foot and is therefore functional.  *See Eliya, Inc.*, 2006 WL 2645196, at *12.

Even assuming, *arguendo*, that the bow could somehow be separated from the shoe, it would have to be independently copyrightable as a work of art.  *See Star Athletica,* 137 S. Ct. at 1016.  This, in effect, would provide Puma with exclusive rights in "casually knotted fabric," generally, whether used as a hair bow, a gift wrap bow, or a bowtie.  There is nothing original about a bow with a standard knot, especially a solid colored bow without any patterns or other two-dimensional expression.  *Baby Buddies, Inc. v. Toys R Us, Inc*., 611 F.3d 1308, 1320 (11th Cir. 2010) (holding that the "bow design is commonplace," is "not original" to plaintiff, and "existed long before [plaintiff] chose to include it" in its design, and thus "fell short of even the low threshold of originality required for copyright protection").  Accordingly, Puma's copyright claim for the Bow Slides is unlikely to succeed.

### B.   Puma Has Not Established a Likelihood of Irreparable Harm

Puma dedicates a scant two and a half pages to irreparable harm, the majority

-19-

of which is spent describing "fast fashion," overviewing the FENTY collection, and making broad, general overtures about speculative harm without specific reference to Forever 21.  DE 21 at 18.  Puma has failed to make the requisite showing for a finding of irreparable harm, and thus, injunctive relief is improper.

### 1.      Puma's Speculations Are Not Evidence

Puma's problem is that everything it points to is purely speculative, and not supported by any evidence whatsoever.  Puma's conclusions about possible lost sales and consumer confusion cannot, as a matter of law, establish irreparable harm.  *See Sapiano*, 2013 WL 12122435, at *5; *Williams*, 2015 WL 4694075, at *2 ("Plaintiff relies on only consumer confusion evidence and wants the Court to believe that he might suffer damage to his reputation or goodwill.").  Puma has not come close to establishing "that irreparable harm is likely, not just possible."  *See Alliance for the Wild Rockies*, 632 F.3d at 1131.

Puma submits one substantive declaration from Adam Petrick ("the Petrick Declaration"), a "global director of brand and marketing for Puma SE," to attempt to lend credence to its conclusory statements.  DE 21-1.  But the declaration, like the Motion itself, offers only broad speculations and unsupported conclusions about *possible* harm, most of which, by the way, are *monetary* in nature, that Puma *may* feel from *any* competition in general.  The Petrick Declaration hypothesizes that "[s]ome customers who have seen the hype for the authentic shoe **may** mistakenly believe that they have purchased the real shoe" and that "[o]ther consumers **may be** discouraged from buying the authentic shoe."  *Id.* at ¶ 21 (emphasis added).

The Petrick Declaration also engages in speculative guesswork about Puma's bow slide, suggesting that "Puma has already seen a lower-than-expected conversion of sales of other Puma shoes in connection with the release of Fenty Bow Slide" and that "[t]he 'Bow Slide' has seen decreased sales compared to Puma's projected sales".  *Id.* at ¶¶ 22-23.  Puma has failed to allege any factual basis to establish a causal link between "decreased sales" and Forever 21's products, or

account for the likely possibility that consumers are purchasing any one of *dozens* of different "bow slides" offered by Prada, Steve Madden, and multiple designers other than Forever 21 and Puma, and that it is fair competition or pure consumer choice that accounts for Puma's hopeful projections being disconnected from reality.

Puma offers up the unsupported speculation that "Puma ***could*** lose brand goodwill with the public, other copycats ***may*** feel emboldened to trade on Puma's intellectual property, or Puma ***may*** find it difficult to partner with brand ambassadors, such as Rihanna." DE 21 at 31 (emphasis added). Puma's Motion should be denied because it fails to cite *any* evidence that it has established goodwill in its shoes or that such goodwill has been harmed irreparably by Forever 21. *See Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014) (citing *Herb Reed*, 736 F.3d at 1250) ("Although preliminary relief may be ordered to prevent harm to a movant's reputation and goodwill, a finding of reputational harm may not be based on 'pronouncements [that] are grounded in platitudes rather than evidence.'").

Not only is Puma's "evidence" speculative, but it also tends to establish the point that any harm that Puma is sustaining is compensable by monetary damages. If the harm can be addressed through monetary damages, injunctive relief is not proper. *See, e.g.*, *eBay*, 547 U.S. at 391.

### 2.    Puma's Delay Prevents a Finding of Irreparable Harm

Puma's delay in bringing this action and seeking copyright registrations weighs heavily against a finding of irreparable harm. *See Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) ("[U]nreasonable delay can defeat irreparable injury and the length of time 'need not be great.'") (affirming district court's denial of copyright plaintiff's motion for preliminary injunction); *Protech Diamond Tools, Incorporation v. Liao*, No. C 08-3684 SBA, 2009 WL 1626587, at *6 (N.D. Cal. June 8, 2009) ("Indeed, undue delay, standing alone, constitutes grounds for rejecting a motion for preliminary injunction.").

1    Although Puma has repeatedly attempted to expedite this proceeding, Puma

2    chose not to request Special Handling by the Copyright Office to process its

3    copyright applications, thereby delaying a potentially adverse determination.[6] *See*

4    ¶¶ 2, 6 of Declaration of Christian D. Ehret ("Ehret Decl.") attached hereto and filed

5    herewith.  Copyright litigants routinely ask for expedited registration, and this

6    would be expected by a litigant seeking a temporary restraining order, preliminary

7    injunction, and expedited hearing.[7]  Even *several days after* this fatal mistake was

8    identified in Forever 21's Motion to Dismiss (DE 45), Puma still chose to forgo

9    expedited registration.[8]  *See id* at ¶¶ 4-6.  Puma's decision to delay examination

10   alone warrants denial of its Motion.

11   As noted in this Court's order denying Puma's Application for TRO, Puma

12   averred that it has been long aware of the acts it now seeks to enjoin.  DE 19 (citing

13   App. 1:28–2:1 ("Forever 21 has a history of releasing knock-offs close in time to the

14   Puma shoe releases."), 2:9–19 ("Forever 21 has counterfeited in the past."), 1:5–6

15   ("Forever 21, in fact, has been sued over 100 times for intellectual property

16   infringement.")).  Puma removed most of these quotes from its Application for TRO

17   before refiling it as the present Motion, but continues to admit to having prior

18   knowledge of the acts it now accuses to be infringing.  DE 21 at 27 ("Defendant has

19   in the past also copied the trade dress of these shoes.").  In view of this lengthy

20   delay, Puma has no basis to claim that it is suffering from imminent and immediate

21   _____

22   [6] Even if the Copyright Office does issue a registration, it does not inquire into the originality of the work.

23   [7] Puma's counsel's website suggests expediting registration "when litigation is imminent" because "[i]t is best not to delay copyright registration for any new work.

24   In a civil action where the registration is filed before the date of the infringement or within three months of first publication of the work, the copyright holder can secure

25   injunctive relief."  Venable, *Fundamentals of Copyright Protection*, https://www.venable.com/fundamentals-of-copyright-protection-01-01-1998/ (last

26   accessed May 16, 2017).

27   [8] The most plausible inference from Puma's failure to request Special Handling is that it is attempting to hurry this Court into enjoining Forever 21 before the

28   Copyright Office determines whether to issue registrations.

1  harm that requires extraordinary relief from this Court.

2  **C.    A Preliminary Injunction Does Not Favor the Public Interest**

3  Puma barely addresses the public interest for or against issuing a preliminary

4  injunction.  Puma characterizes this prong as "the right of the public not to be

5  deceived or confused," but fails to mention that such considerations must be

6  weighed against "the value placed on free competition" and "the consumer's ability

7  to obtain the lowest priced goods."  *See Calvin Klein Cosmetics Corp. v. Lenox*

8  *Labs., Inc*., 815 F.2d 500, 505 (8th Cir. 1987) (citing *Societe Comptoir De*

9  *L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't Stores, Inc*.,

10  299 F.2d 33, 37 (2d Cir. 1962)) (vacating a preliminary injunction because the

11  "strong public interest in lowest possible prices was not taken into account").  "If [a]

12  defendant is competing lawfully, the public interest supports the denial of an

13  injunction."  *Waldmann Lighting Co. v. Halogen Lighting Sys., Inc*., No. 91 C 3491,

14  1993 WL 243388, at *5 (N.D. Ill. July 1, 1993).  As the United States Supreme

15  Court has instructed, "[c]onsumers should not be deprived of the benefits of

16  competition with regard to the utilitarian and esthetic purposes that product design

17  ordinarily serves… ."  *Wal-Mart Stores, Inc*., 529 U.S. at 213.

18  As explained above, the market is crowded with various companies offering

19  bow slides, fur slides, and creeper-style sneakers.  Puma, Forever 21, and dozens of

20  other companies market these classic shoe designs and it is in the public's best

21  interest to allow all of them to freely compete based on quality, style, price, and

22  brand recognition, rather than allowing one of the competitors to target and attempt

23  to prevent specific competitors from participating in the marketplace.

24  **D.    The Balance of Equities Do Not Sharply Favor Puma**

25  Puma must show that the balance of equities tip *sharply* in its favor.  *See*

26  *Alliance for the Wild Rockies*, 632 F.3d at 1135.  Yet, Puma merely recites the

27  standard without pointing to any evidence.  DE 21 at 31.  The only reasoning

28  specific to this case that Puma provides is speculative and duplicative of its

-23-

irreparable harm arguments: "Puma **could** lose brand goodwill with the public, other copycats **may** feel emboldened to trade on Puma's intellectual property, or Puma **may** find it difficult to partner with brand ambassadors, such as Rihanna." DE 21 at 31 (emphasis added).  Such speculation is not enough to establish irreparable harm and is certainly not enough to show that the balance of equities tip sharply in Puma's favor.  Indeed, there is no evidence whatsoever that any of these things are occurring—indeed, Rihanna continues to affiliate with Puma to this date, and thus, there is no suggestion that its current brand ambassador or future potential ambassadors have been negatively impacted by Forever 21's legitimate competition.

Even though Forever 21 need not show that the equities tip in its favor, they do.  Enjoining Forever 21 will unfairly prejudice Forever 21 among the dozens of other companies selling these classic shoe designs, causing Forever 21 to lose market share and investment.  *See, e.g.*, *Spark Indus., LLC v. Kretek Int'l, Inc.*, No. CV 14-5726-GW ASX, 2014 WL 4365736, at *18 (C.D. Cal. Aug. 28, 2014) ("[C]onsidering the possible hardship to [the defendant] and the irreparable injury evidence [the plaintiff] has put forward, the Court would find that the balance of hardships does not tilt so far in [the plaintiff's] favor that it needs to consider the other preliminary injunction requirements"); *Lindberg A/S v. Kazak-Mars, Inc.*, No. 213CV04808SVWAGRX, 2013 WL 12138762, at *6 (C.D. Cal. Aug. 28, 2013) ("Because Plaintiff is not able to establish that the balance of hardships tips in its favor, let alone sharply, the Court does not analyze whether 'serious questions going to the merits were raised.'").

### E.    Puma's Requested Relief Is Incommensurate With Its Allegations

Puma seeks to broadly enjoin Forever 21 from "[p]roducing, selling, offering for sale, distributing, advertising, providing, or promoting any goods incorporating Puma's intellectual property, or that so resemble Puma's intellectual property as to be likely to cause confusion, mistake, or deception."  DE 21 at 2.  Puma seems to assume that "Puma's intellectual property" is self-evident, and can be easily

interpreted.  Puma's request for injunctive relief is directed to perpetually and prospectively restraining Forever 21 from making or selling broad *categories* of shoes based on future products that do not yet exist.  To this end, Puma contends that injunctive relief is necessary for a "Fur Slide" to be released in the "near future," without identifying any details about this future product. DE 21 at 19. "Injunctive relief, however, must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991); *see also OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 602 F. App'x 669, 673 (9th Cir. 2015) (narrowing preliminary injunction for trademark infringement to exclude "activities that are not alleged, much less shown, to have caused injury").

Puma's Motion declares that "Defendant is currently selling near copies of the Fenty Shoes through, at least, its website." DE 21 at 15.  However, at the time of filing this brief, many of the specific shoes identified in the Motion cannot be located on Forever 21's website.  For example, while Puma's motion repeatedly focuses on the "olive" and "pink" colors of the bow slide (despite color not being part of its asserted trade dress), Forever 21's website (as of the filing of this brief) only shows bow slides made by Lust for Life USA (a third-party brand sold by numerous retail outlets), none of which are "olive."  Forever 21's website also does not show any "creeper" sneakers and, if it does sell this classic shoe design again on its website in the future, it is likely to differ from those previously offered.  Puma cannot establish irreparable harm because it cannot identify ongoing activity that can even be enjoined.

Puma's requested relief is overbroad and not narrowly tailored, and for this additional reason, the Motion should be denied.

## IV.   CONCLUSION

For all of these reasons, Puma has failed to establish any right to injunctive relief and its Motion should be denied.

-25-

Case No. 2:17-CV-02523-PSG-E
DEFENDANT FOREVER 21, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1    Dated:  May 22, 2017          Respectfully submitted:

2                                  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4                                  By:    _____
                                                  /s/ Laura L. Chapman
5                                                 LAURA L. CHAPMAN

6
                                   Attorneys for Defendant FOREVER 21, INC.
7

8
9    Dated:  May 22, 2017          Respectfully submitted:

10                                 THE WEBB LAW FIRM

11

12                                 By:    _____
                                                  /s/ Kent E. Baldauf
13                                                KENT E. BALDAUF, JR.
                                                  CECILIA R. DICKSON
14                                                CHRISTIAN D. EHRET

15
                                   Attorneys for Defendant FOREVER 21, INC.
16                                             *admitted pro hac vice*

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:17-CV-02523-PSG-E
DEFENDANT FOREVER 21, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   May 22, 2017                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


                                         By:   */s/ Laura L. Chapman*
                                                Laura L. Chapman

                                         Attorneys for Defendant FOREVER 21, INC.